IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MICHAEL M. FORD, | ) | |
| Plaintiff, | ) | Civil Action No. 7:16cv00370 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| GREGORY T. GILLENWATER, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Michael M. Ford, a Virginia inmate proceeding *pro se*, filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendants failed to protect him, denied him due process, improperly responded to grievances and/or appeals, and retaliated against him for filing grievances. Defendants filed a motion for summary judgment, and Ford responded, making this matter ripe for disposition. In response to the motion for summary judgment, Ford also filed a motion to amend his allegations concerning his due process claim which the court will grant. In addition, the court previously granted defendants' motion for a protective order limiting discovery until the issue of qualified immunity is decided and, in doing so, limited the issues before the court solely to defendants' defense of qualified immunity. Having considered the record, the court concludes that the defendants' motion for summary judgment must be dismissed in part, denied in part, and granted in part.

I. BACKGROUND

Ford alleges that on March 22, 2016, while participating in recreational time in the general population unit at Wallens Ridge State Prison (Wallens Ridge), he was "assaulted by a group of known and documented gang members" that formed an "inescapable" ring around him while one member, "wielding an institutional made knife," approached him. Ford states that he "attempted to deflect and defend hi[m]self from the knife blows" as he "reacted out of fear for

his life." Despite his efforts, however, he was stabbed and "blinded" in his right eye. Ford states that he yelled for help "for at least a full minute" before he was stabbed in the eye. (Compl. 6, 10, Dkt. No. 1.)

Ford alleges that after the stabbing in his eye, he was "immediately attacked" by seven to ten more gang members, two to three of whom also had knives. Ford states that he was "sever[ely] beaten" and stabbed four more times in the back. (*Id.*)

Ford asserts that prior to this incident, defendants Warden Fleming and Chief of Security Anderson were "aware of the pervasive risk to the inmate population in regard to these gang initiated assaults, by the sheer number of which regularly occur throughout the institution." Ford argues that Fleming and Anderson were deliberately indifferent to unsafe conditions and failed to protect him from the March 22, 2016 attack. (Compl. 7, 9.)

Ford claims that the gymnasium area is a "known and troublesome spot" and a "repeated and reoccurring stage or platform for these gang planned assaults." Ford states that "among the factors which contribute to the high occur[e]nce of these gang related inmate assaults[,] especially in the gym area[,] is a lack of supervision from staff." "Specifically, he states that "there has never been a rec[reation] supervisor or correctional floor officer stationed in the gym in light of the serious threat of gang violence." (Compl. 7.)

Ford states that there is an observational tower located in the middle of the gymnasium. Ford alleges that institutional protocol mandates that "a second officer must occupy the booth or tower to assume an observational post and bear the responsibility of the gun[,] which is used as a non[-]lethal (rubber bullets) de[-e]scalation method," but, that "there has never been a second officer placed there." Ford claims that there is one officer in that tower, who is the "sole source of supervision for the entire gym area," but that officer is "positioned in the opposite side of the tower to a control panel which directly faces the medical dep[artment] and a breezeway which

2

connects both sides of the prison." This officer is tasked with opening and closing both gates to allow inmates and staff "from both sides of the yard" entry into the medical department and the breezeway. (Compl. 7-8.)

Ford asserts that "another contributing factor" to the gang attacks is "the lack of strategically placed security cameras which actually function properly." And, he claims that "among the ultimate factors" contributing to these assaults is "the failure to create or enforce a policy which would even offer the minimal amount of protection to the inmate population against repeated gang assaults." (Compl. 8.)

Ford argues that Wallens Ridge "has a culture that tolerates" gang attacks. By way of example, Ford explains that the gang attacks "are being carried out by known[,] documented[,] and instititonal[ly] recorded gang members" and, after these "brazen" attacks, the gang members are given "basic institution[al] infractions," which result in "average segregation time," after which they return straight back to general population." He also states that the same individuals are committing these attacks "over and over" again. (Compl. 8-9.)

Ford claims that during the attack on March 22, 2016, defendant Officer Gillenwater was assigned to the tower above the gymnasium. Although Gillenwater was tasked with providing supervision over the gymnasium, he was located on the "complete opposite side of the tower," which provided him "absolutely no way to observe the gymnasium area." Ford alleges that while the attack on him went on for two to three minutes, Gillenwater "remained on the control panel[,] completely abandoning all observational duties." Ford argues that had Gillenwater not been "so careless" and if proper observational protocols had been followed, the attack "very likely" would not have happened or, at least, his injuries could have been minimized. (Compl. 9-10.)

After the March 22, 2016 assault, Ford was taken to the Wallens Ridge medical department. The next day, he was taken to an outside emergency room. When he returned to Wallens Ridge, "partially blinded," he was admitted to the medical department for approximately four weeks, during which time he "partially regained sight." When he was released from the medical department, he was placed in the segregation unit, in administrative segregation status, for approximately two months, during which time he and "members of the community" wrote "numerous" complaints and letters concerning "the institution being at fault" for his injuries, the "gang problems at Wallens Ridge," and the "tolerance" of Wallens Ridge's administration toward gang members. (Compl. 11-12.)

On May 23, 2016, Ford was released from segregation. The next day, however, he was "abruptly placed back in segregation with no reasoning or explanation, except that it was based on [Warden Fleming's] direct orders." Ford states that he had broken no rules and the only "provocation" for him being placed in segregation was his filing of grievances and letters concerning the incident and Wallens Ridge. Ford states that he was placed back in segregation in retaliation for him filing those grievances and letters. (Compl. 12-13.)

Ford filed additional grievances complaining that his placement in segregation was based on retaliation, and on May 27, 2016, defendant Segregation Unit Manager Collins responded to a grievance and stated that Ford was "placed in segregation under investigation per Warden Fleming [and] the investigators w[ould] see [him] and address the issues." Ford argues that his right to due process was violated when he was given no notice or hearing before being placed back in the segregation unit. Ford remained in segregation for seven days before he received an Institutional Classification Authority (ICA) hearing. (Compl. 13-14.)

On May 31, 2016, defendant Segregation Counselor Treadway gave Ford an ICA hearing disposition form which indicated that Ford's "continual placement in segregation was general

4

detention per Mr. Fleming." After receiving this disposition, Ford filed grievances, complaining that he had received no notice or hearing and was never "given a direct reason or any reason at all to justify [his] placement in segregation." Collins responded to one of the grievances by stating, "You are not under investigation[,] your status is administrative seg[regation.]" Ford appealed, and defendant Fleming deemed the appeal "unfounded."[1] Ford appealed Fleming's response, and defendant Regional Administrator Elam determined that the responses he had received were appropriate and that no procedural violations were noted. Ford argues that Elam disregarded the violation of due process and failed to "rectify[] it." (Compl. 14-17.)

Ford also argues that defendants Light, Collins, Treadway, Doe, Anderson, and Combs failed to provide him with due process despite the "delegating authority mandating that they do so as the ICA committee." (Compl. 18.)

II. DISCUSSION

**A. Motion to Amend**

After defendants filed their motion for summary judgment, Ford filed a motion to amend seeking to "expound on the atypical and significant hardships" that he suffered "as a result of being placed in segregation in violation of [his] due process" rights. Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, a party may amend its pleading with the court's leave, and the "court should freely give leave when justice so requires." Finding it in the interest of justice, the court will grant his motion to amend, and his complaint shall be considered amended. Because the complaint as amended may change the arguments presented in defendants' motion for summary judgment as to due process, the court will dismiss defendants' motion for summary judgment without prejudice as to Ford's due process claim.

---

[1] Ford argues that Fleming should not have handled the appeal because his prior retaliation against Ford was the subject of the grievance.

5

### B. Protective Order

Defendants argue in their motion for summary judgment that they are entitled to qualified immunity. Defendants also filed a motion for a protective order to limit discovery until the court determines the qualified immunity issue. The court granted defendants' motion for a protective order and indicated that, in doing so, its review of defendants' motion for summary judgment would be limited to their qualified immunity argument. *See* Dkt. No. 33. Thus, to the extent defendants argue any other basis upon which they believe they are entitled to summary judgment, their motion for summary judgment is dismissed without prejudice as to those arguments.

### C. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts the affirmative defense of qualified immunity, the court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right[,]" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In determining whether the law was clearly established, the court "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit Court of Appeals], and the highest court of the state in which the case arose.'" *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (1999)), *vacated on other grounds*, 133 S. Ct. 9 (2012).

The onus is on a defendant asserting qualified immunity to actually put forth authorities and argument showing that he is entitled to it. "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013).

In support of their defense of qualified immunity, defendants summarily assert that Ford has made "no allegations of conduct which violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Mot. Summ. J. 19, Dkt. No. 24.) Because defendants point only to Ford's allegations and not facts established by other means, the court considers only Ford's allegations in its analysis.

**1. Failure to protect**

Ford alleges that defendants Fleming, Anderson, and Gillenwater were deliberately indifferent to unsafe conditions and failed to protect him in violation of the Eighth Amendment. The court finds that Ford's allegations state a constitutional violation and that the defendants' duty to protect Ford from physical harm inflicted by other inmates was clearly established at the time of the attack. Accordingly, the court will deny qualified immunity to the defendants as to Ford's failure to protect claims.

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). Specifically, prison officials must "protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833; *see Odom v. S.C. Dep't of Corr.*, 349 F.3d 765 (4th Cir. 2003). To establish that prison officials are liable under § 1983 for failing to protect, a plaintiff must show: (1) a serious or significant physical or emotional injury, and (2) that the prison official had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834.

As to the second prong, the requisite state of mind is one of "deliberate indifference" to the inmate's health or safety. *Id.* A prison official shows deliberate indifference if he or she knows of an excessive risk to an inmate's safety and disregards or fails to respond to that risk. *Id.* at 837. "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Miltier,* 896 F.2d at 851-52. Mere knowledge of facts showing a general risk of harm cannot satisfy the subjective inference element of a failure to protect claim "unless (a) the plaintiff had been subject to specific threats; (b) the risk of attack was pervasive at the facility; or (c) the plaintiff belonged to a class identified as vulnerable to assaults . . . ." *Randolph v. Maryland*, 74 F. Supp. 2d 537, 542 (D. Md. 1999).

Ford alleges that gang attacks "regularly occur" at Wallens Ridge. He also asserts that the gymnasium where he was attacked is a "known and troublesome spot" for "repeated" gang attacks, there is insufficient staff supervising the area, the cameras in the area do not work and/or are not "strategically" placed, and Wallens Ridge administrators permit a culture of tolerance toward gangs.

Ford claims that Fleming and Anderson knew that the gang assaults were a "pervasive" risk to the inmate population because of these circumstances, but they failed to take any action to prevent the attacks. A supervisor may be liable for the actions of a subordinate if: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there

8

was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. *Slakan v. Porter*, 737 F.2d 368, 373-74 (4th Cir. 1984). A plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* at 373. "A supervisor may be held liable under a tacit authorization theory if that supervisor fails to take action in response to a known pattern of comparable conduct occurring before the incident at issue took place." *Danser v. Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014).

Ford further alleges that Gillenwater recklessly disregarded the substantial risk of danger. Ford claims that on the day that he was attacked, Gillenwater was assigned to the tower to supervise the gymnasium. Despite the history of repeated gang attacks in the gymnasium, Ford states that while he was being attacked for two to three minutes, and yelling for help for one of those minutes, Gillenwater "completely abandon[ed] all observational duties."

Viewing the facts in the light most favorable to Ford, the court concludes that his allegations describe deliberate indifference by Fleming, Anderson, and Gillenwater. Further, Ford clearly alleges a serious and significant injury from multiple stab wounds, including one to his eye that caused vision impairment. Moreover, it was clearly established at the time of the attack on Ford that prison officials had a duty to protect inmates from a "pervasive" risk of attack by other inmates. Accordingly, the court will deny qualified immunity to defendants Fleming, Anderson, and Gillenwater as to the Ford's failure to protect claims.

**2. Grievance Responses**

Ford alleges that defendants did not respond appropriately to the grievances and/or appeals that he filed. The court finds that Ford's allegations do not demonstrate a violation of a federal right and, therefore, will grant qualified immunity and summary judgment as to Ford's grievance response claims.

To state a cause of action under § 1983, a plaintiff must establish that he has been deprived of rights guaranteed by the constitution of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42 (1988). "Ruling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation," *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007), and inmates do not have a constitutionally protected right to access the grievance procedure, *see, e.g.*, *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Accordingly, defendants are not liable under § 1983 for their responses to the grievances and/or appeals. *See Brown v. Va. Dep't Corr.*, No. 6:07cv33, 2015 U.S. Dist. LEXIS 12227, at *8, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009); *see also Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (holding allegations that prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the alleged underlying deprivation). Accordingly, the court will grant qualified immunity and summary judgment as to Ford's grievance and appeal responses claims.

### 3. Retaliation

Ford alleges that Fleming retaliated against him for filing grievances. The court finds that Ford's allegations state a constitutional violation and that his right to be free from retaliation for filing grievances was clearly established at the time. Accordingly, the court will deny qualified immunity as to Ford's retaliation claim.

"To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Snodgrass v. Messer*, No. 7:16CV00050, 2017 U.S. Dist. LEXIS 34329, 2017 WL 975992, at *4 (W.D. Va. Mar. 10, 2017). Prison officials may not take actions that violate an inmate's "First Amendment right to be free from retaliation for filing a grievance" under the prison's established grievance procedure. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017).

Ford alleges that he filed grievances concerning "the institution being at fault" for his injuries, the "gang problems at Wallens Ridge," and the "tolerance" of Wallens Ridge's administration toward gang members. He also alleges that he was placed in segregation at Fleming's "direct orders" for no reason other than Fleming's retaliation for Ford having filed the grievances.

Viewing the facts in the light most favorable to Ford, the court concludes that his allegations describe a retaliation claim. Moreover, Ford's right to file a prison grievance free from retaliation was clearly established at the time. *Booker*, 855 F.3d at 545 (finding that the right was clearly established at least as early as 2010). Accordingly, the court will deny qualified immunity to defendant Fleming as to the Ford's retaliation claim.

### III. CONCLUSION

Based on the foregoing, defendants' motion for summary judgment is dismissed in part as to Ford's due process claims and as to all of defendants' arguments concerning the other claims, except as to their defense of qualified immunity; denied in part as to qualified immunity for Ford's claims concerning failure to protect and retaliation; and granted in part as Ford's claims

concerning grievance and responses.

An appropriate order will be entered.

Entered: September 25, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge