IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MICHAEL M. FORD,                    )
     Plaintiff,                    )
                               )    Case No. 7:16-cv-00370
v.                                  )
                               )    By: Elizabeth K. Dillon
GREGORY T. GILLENWATER, *et al.*,    )       United States District Judge
     Defendants.                   )

**MEMORANDUM OPINION**

Michael M. Ford, a Virginia inmate proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983. The matter is before the court on a motion for summary judgment as to Ford's claims that the defendants failed to protect him, housed him in segregated confinement without due process, and retaliated against him for filing grievances, in violation of his constitutional rights. Ford also raises a supplemental negligence claim under state law. Having considered the record, the court concludes that the defendants' motion for summary judgment must be granted in part and denied in part.

I. BACKGROUND

**A. The Inmate Attack**

Ford alleges in his verified complaint that on March 22, 2016, during recreation in the general population unit at Wallens Ridge State Prison (Wallens Ridge), he was "assaulted by a group of known and documented gang members." One inmate approached Ford, "wielding an institutional made knife," while the others formed an "inescapable" ring around him. Ford "reacted out of fear for his life," trying to "deflect and defend hi[m]self from the knife blow." He held the attacker off and yelled for help "for at least a full minute" before the inmate stabbed and "blinded" his right eye. Immediately thereafter, seven to ten more gang members, two to

three of whom also had knives, attacked Ford, uninterrupted, for two or three more minutes. He was "sever[ely] beaten" and stabbed several times in the back. (Compl. 6, 10, Dkt. No. 1.)

Ford claims that Officer Gillenwater was posted in the guard tower on March 22, 2016, as the only officer supervising recreation. According to Ford, for the first two to three after the inmates began assaulting him in the gym, Gillenwater "remained on the control panel" on the other side of the tower where he had no view of the gym. Ford alleges that, but for Gillenwater's negligence in failing to follow proper observational protocols, the attack "very likely" would not have happened, or Ford's injuries would have been less serious. (Compl. 9–10.)

Ford contends that Warden Fleming and Chief of Security Anderson have failed to create and enforce policies to protect general population inmates from gang violence. He alleges that on March 22, 2016, these defendants must have been "aware of the pervasive risk [of] gang initiated assaults," based on the "sheer number" of such attacks that had occurred regularly—throughout the prison and repeatedly in the gym. He claims the defendants tolerate gang violence by inmates, well known and documented by their institutional histories as gang members, who repeatedly carry out "brazen" attacks for a gang, only to receive minor disciplinary infractions and short terms in segregation, before returning to general population. Ford asserts that although policy calls for two officers to be posted in the guard tower to supervise recreation, the defendants routinely use only one officer, who is often distracted by his other duties. Ford also blames gang attacks on an alleged "lack of strategically placed security cameras which actually function properly." (Compl. 7–9.)

## B. Ford's Housing Placement after the Attack

After the inmate assault, Ford's eye was full of blood. Officers took him to the medical unit and later to an outside hospital. Even after treatment, he remained "partially blinded." He

spent more than a month in the medical unit.  On April 13, 2016, when Ford had "partially

regained sight," he was assigned to the segregation unit, where he remained for two months.

During this time, he filed institutional complaints that he had been attacked by "well known gang

members" and that the prison's defective safety policies had "caused" his injuries.[1]  He also

wrote letters about prison officials' tolerance of the gang violence problem at Wallens Ridge to

family and members of the community, who allegedly passed on his letters to other state

officials, asking for reform.  Some of Ford's concerns in this correspondence were forwarded to

Virginia Department of Corrections (VDOC) administrators and, in turn, sent to the VDOC

Correspondence Unit for investigation.[2]  (Compl. 11–12; V.S. 2–5, 11, Dkt. No. 2; Ford Aff. ¶

29 and Ex. G, Dkt. No. 38.)

On May 23, 2016, "after numerous complaints calls and E-mails . . . were made and sent

on [Ford's] behalf," Ford was moved from segregation to a general population unit.  On May 24,

2016, however, he was "abruptly placed back in segregation with no reasoning or explanation,

except that it was based on [Warden Fleming's] direct orders."  Fleming failed to ensure that

Ford received notice or a hearing about this placement, which lasted for weeks.  Ford filed a

---

[1]  A copy of one such institutional complaint stated:

On March 22, 2016, an altercation took place where I was attacked by people who I was later
informed were Gang members, during this attack I was beaten and stabbed four times in my back
and one in my eye . . . .  This attack happened uninterrupted in the gym no security officers were
there on the floor to stop it or prevent it nor was there an officer in the booth "specifically"
stationed to the gym area and this institution is not only liable but criminally negligent in the
causing of my injuries.

This document was received by prison officials on May 2, 2016.  An officer responded that according to the
investigation of the incident and review of the surveillance camera footage, Ford's claims were "unfounded."
(Opp'n Mot. Summ. J. Ex. K, Dkt. No. 49-1.)

[2]  Ford's exhibits include three letters from the VDOC Correspondence Unit, advising him of an email or
letter it had received about his complaints and concerns about prison safety.  The VDOC response letters in the
record are dated May 16, 2016 (regarding an email from Ford's mother), June 23, 2016 (regarding Ford's letter
originally mailed to Governor Terry McAuliffe), and August 25, 2016 (regarding Ford's letter to a community
activist).  (V.S. 11, Dkt. No. 2; Ford Aff, Exs. A & G, Dkt. No. 38-1.)

grievance, claiming that Fleming had placed him back in segregation in retaliation for his prior grievance and letters about the tolerance of gang violence at the prison. In violation of policy, Fleming (the subject of the grievance) responded to it, stating that Ford "was placed back in segregation due to information Wallens Ridge . . . received from the Offender Correspondence Unit." Fleming ruled the grievance to be unfounded, and Regional Director Elam upheld that finding on appeal. (Compl. 12–16, 19–20, 35.)

Ford alleges that Lieutenant Light, Unit Manager Collins, Segregation Counselor Treadway, Deputy Warden Anderson, and Assistant Warden Combs, as members or supervisors of the Institutional Classification Authority (ICA) at Wallens Ridge, failed to fulfill their obligations under VDOC classification procedures to provide Ford with due process concerning his initial and continued assignment to segregation after May 25, 2016. Ford did not receive any notice or paperwork about his status or have an ICA hearing until he had already been in segregation for seven days. Then, defendant Treadway gave him an ICA hearing disposition form, indicating that he had been in "general detention per Mr. Fleming," but the ICA had recommended a change to administrative segregation, with no reason given. Ford filed grievances about these and other procedural defects and violations, but the grievances were ruled unfounded. He appealed to Elam, who upheld the prior rulings without acknowledging or correcting the procedural defects. No one would give Ford a direct reason for his continued segregation status. At one point, Collins stated that Fleming had placed Ford under investigation, but, two weeks later, Collins indicated that Ford was not under investigation and that his status was "administrative segregation." During this time, Ford wrote additional letters to the community and the governor's office about prison staff "misconduct" and being held in segregation for no reason. (Compl. 12–18, 20, Dkt. No.1; Ford Aff. ¶¶ 18–35, Dkt. No. 38.)

Ford remained in segregation at Wallens Ridge for several months. While in segregation status, he could not attend the weekly group religious services, have weekly visits, participate in vocational programming, socialize with other inmates, or order food items from the commissary. He was limited to two telephone calls per month on assigned days and one shower every 72 hours. He had to undergo a visual strip search, be placed in handcuffs and shackles, and be escorted by officers to the shower and back to his cell. By comparison, general population inmates can shower and make telephone calls every day, socialize, order commissary food, and go to religious services or classes. From his time in segregation, Ford allegedly suffered "severe mental anguish and psychological depression." (Am. Compl. 2–4, Dkt. No. 36.)

## C. Procedural History and Remaining Claims

Ford filed this § 1983 action in August 2016. The defendants filed a motion for summary judgment and a stay of discovery on the ground of qualified immunity. The court stayed discovery. Ford responded to the defendants' motion and moved to amend his due process claim. By opinion and order entered September 25, 2017, the court granted Ford's amendment; granted qualified immunity to the defendants only as to Ford's claims concerning grievance and responses; denied qualified immunity as to the failure to protect and retaliation claims; and dismissed their motion without prejudice as to their arguments on the merits of his other claims.

Liberally construing Ford's complaint as amended, his remaining claims are: (1) Fleming and Anderson failed to protect Ford from gang violence on March 22, 2016, in violation of the Eighth Amendment; (2) Fleming and Anderson's failure to design and enforce policies to protect against gang violence, and Gillenwater's failure to supervise the gym on March 22, 2016, "constituted negligence under the Virginia Tort Claims Act" (Compl. 19); (3) Fleming and ICA

participants[3] Treadway, Light, Collins, Anderson, and Combs placed or maintained Ford in segregation without procedural due process, in violation of the Fourteenth Amendment; and (4) Fleming ordered Ford's placement in segregation on May 24, 2016, in retaliation for Ford's grievances and letters about gang problems at Wallens Ridge, in violation of the First Amendment. The defendants have renewed their motion for summary judgment with supporting affidavits (Dkt. No. 46), Ford has responded with briefs, affidavits, and exhibits (Dkt. Nos. 38, 49), and the motion is ripe for disposition.

## II. DISCUSSION

### A. Summary Judgment Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A movant is entitled to summary judgment only if the record as a whole *could not* lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).[4] On the other hand, where the ultimate factual conclusions to be drawn are in dispute, summary judgment is not appropriate. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility at the summary judgment stage. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995)

In considering a motion for summary judgment under Rule 56, a court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Mitchell v. Data Gen.*

---

[3] Ford raised this same claim against "Jane Doe," an ICA member whom Ford has never identified by name. By order entered October 27, 2016 (Dkt. No. 19), the court notified Ford that if he did not amend to identify this defendant within ten days, all claims against her would be dismissed without prejudice. Based on his failure to respond to that order or identify this individual, all claims against Jane Doe will be dismissed without prejudice. *See* Fed. R. Civ. P. 4(m).

[4] The court has omitted internal quotation marks, alterations, or citations here and throughout this opinion, unless otherwise noted.

*Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993). The court "scrutinizes" each party's case "to determine whether the [party] has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Id.* A nonmovant, to defeat a motion for summary judgment supported by affidavits, "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Detailed factual allegations in a verified, *pro se* complaint, if based on personal knowledge, may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams*, 952 F.2d at 823. Ford cannot defeat the defendants' properly supported summary judgment motion, however, with mere groundless generalizations or speculation. *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) ("Mere speculation by the non-moving party cannot create a genuine issue of material fact."). A plaintiff cannot use a response to a motion for summary judgment to amend or correct the complaint challenged by the motion for summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

**B. Official Capacity Damages**

As a preliminary matter, Ford cannot sue the defendants in their official capacities under § 1983. Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, the court will grant the defendants' motion for summary judgment as to all claims against the defendants in their official capacities.

## C. Failure to Protect

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment's prohibition on cruel and unusual punishment imposes a duty on prison officials to take "reasonable measures to guarantee the safety of the inmates," a duty that includes "protect[ing] prisoners from violence at the hands of other prisoners." *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). A prisoner claiming that a prison official failed to keep him safe from other inmates must show that (1) objectively, the prisoner was "incarcerated under conditions posing a substantial risk of serious harm" and suffered such harm, and (2) subjectively, the official had a "sufficiently culpable state of mind," namely, "deliberate indifference to inmate health or safety." *Id.* at 133.

The court concludes that Ford's injuries sustained in the altercation on March 22, 2016, were sufficiently serious to satisfy the first, objective prong of this standard. Astutely, the defendants do not argue otherwise.

"[D]eliberate indifference entails more than ordinary lack of due care for the prisoner's interests or safety, and more than mere negligence, but less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result." *Id.* Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Therefore, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm *and* disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847 (emphasis added).

A prison official's subjective actual knowledge can be proven through circumstantial evidence showing, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer,* 511 U.S. at 842 (quotation marks omitted). Direct evidence of actual knowledge is not required. *See id.* at 842–43.

Accordingly, prison officials may not simply bury their heads in the sand and thereby skirt liability. "[E]ven a guard able to prove that he was in fact oblivious to an obvious injury of sufficient seriousness may not escape liability if it is shown, for example, that he merely refused to verify 'underlying facts that he strongly suspected to be true,'" or that he "'declined to confirm inferences of risk that he strongly suspected to exist.'" *Brice* [*v. Virginia Beach Corr. Ctr.*]*,* 58 F.3d [101,] 105 [(4th Cir. 1995)] (quoting *Farmer,* 511 U.S. at 843 n. 8).

*Makdessi*, 789 F.3d at 133–34. On the other hand,

prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted.* A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions . . . .

*Farmer*, 511 U.S. at 844–45 (emphasis added).

In his complaint, Ford alleges that before his injuries occurred on March 22, 2016, gang attacks regularly occurred at Wallens Ridge because of insufficient staff supervision, violations of safety policies, inoperable or poorly placed prison cameras, and a prison-wide tolerance of known gang members and their activities. Ford contends that from the number of previous attacks, particularly in the gym, Fleming and Anderson[5] must have known that these prison practices created a "pervasive" risk of gang attacks on general population inmates, but they failed to take any action to correct the safety issues and prevent the attacks.

---

[5] In its prior opinion in this case, the court construed Ford's complaint as asserting an Eighth Amendment claim against Gillenwater for deliberate indifference to Ford's safety. His later submissions, however, clearly argue only a negligence claim against this defendant, which the court will separately address. In any event, any § 1983 claim that Gillenwater failed to protect Ford would fail for the reasons discussed herein.

The defendants agree that gang activity presents continuing and serious security concerns for the VDOC. Within its facilities, gangs have been known to cause planned disturbances, riots, drug distribution, money laundering using inmate trust accounts, work stoppages, and violent assaults. The defendants' affidavits and exhibits indicate, however, that the VDOC has a policy of "zero tolerance" for any inappropriate or criminal behavior by individuals or groups, including gangs and their activities as defined in Virginia Code § 18.2-46.1, *et seq.* Inmates are prohibited from joining, recruiting for, associating with, participating in, or acting in concert with any individual or group that *may* constitute a gang. Inmates are also prohibited from owning, creating, possessing, or passing to others any correspondence, documents, drawings, or symbols of any type that indicate gang involvement. Violations of these policies are prosecuted as criminal offenses under state law, when warranted. (Fleming Aff. ¶¶ 5–6, Dkt. No. 47-1.)

A Wallens Ridge Intel Officer states that according to VDOC records, gang fights in the gym are not frequent occurrences. In 2014, only three fights occurred in the gym, none of which were gang-related. In 2015, *no* fights occurred in the gym. Between January 2016 and January 2017, four fights occurred in the gym. Three of these fights involved gang influences, but were not triggered by gang affiliation. For example, one of the fights began as an argument over a game of basketball. One inmate punched another inmate, who happened to be a gang member. Because of that individual's gang affiliation, other members of his gang then stepped into the fight. (Harris Aff. ¶¶ 4–7, Dkt. No. 47-4.)

Contrary to Ford's allegations, Wallens Ridge protocol places one gun post officer in the tower twelve hours per day, seven days a week. That officer is responsible for monitoring inmate activity in the gym and for operating the control panel to open gates into that area and the

nearby gates into the medical/dental area.[6]  (Anderson Aff. ¶ 6, Dkt. No. 47-3.)  Wallens Ridge

also uses cameras to monitor inmate activity in the gym.  Prior to October 2016, there were two

stationary, "rapid-eye" video cameras and one PTZ (pan, tilt, zoom) camera in the gym.  (Harris

Aff. ¶ 8.)

On March 22, 2016, Gun Post Officer Farmer was manning the observation tower in the

gym during recreation.  When he observed inmates fighting, he promptly sounded an audible

alarm in the gym and ordered the inmates to stop fighting and lay face down on the floor, which

they did.  Then, Farmer announced "Fight in the gym" over the radio, other officers reported to

the gym to assist in searching each inmate, and the pod was placed on lockdown.  When officers

searching Ford saw blood on the back of his shirt, they restrained him and escorted him to the

medical unit.  Review of the rapid-eye video indicated that fourteen inmates were involved in the

altercation and that Ford threw the first punch.  All of these inmates were charged with a

disciplinary infraction for fighting and placed on restrictive housing.[7]  Some of the inmates in

this group are identified as having been affiliated with gangs.  The defendants found no reason to

believe, however, that the fight on March 22, 2016, was prompted by gang-related activity, and

the search of the inmates that day did not recover any weapons.  (Anderson Aff. ¶¶ 4–5 and Encl.

A-C; Fleming Aff. ¶ 7.)

Ford does not dispute the accuracy of the defendants' evidence in response to his claim

that Fleming and Anderson (through Wallens Ridge policies and practices) failed to protect him

from being injured in the 2016 assault in the gym.  He also provides no evidence of his own to

---

[6]  In the past, two officers have been posted in the tower as needed for special religious services or for activities involving outside visitors, such as a job fair.  A second gun post officer is not required by policy, however. (Anderson Aff. ¶ 6.)

[7]  After disciplinary proceedings, Ford was found guilty of this infraction and fined $15.00.  (Collins Aff. ¶ 7, Dkt. No. 47-2.)  Ford does not raise any claims in this case concerning these disciplinary proceedings.

support his conclusory assertions in the complaint about a tolerance of gangs at Wallens Ridge. He submits no information about the disciplinary records, gang affiliations, or particular gang activities of any of the inmates involved in the fight, suggesting that any of them presented an excessive risk to other inmates in general, or to Ford, in particular. Similarly, Ford does not offer affidavits or documentation about any instance of gang activity or violence related to staffing mistakes, camera problems, or lax discipline of gang members. At the summary judgment stage, he cannot defeat the defendants' properly supported summary judgment motion with the generalizations and speculative theories alleged in his verified complaint. *Cox*, 249 F.3d at 299. He simply fails to show that those generalizations in his complaint were based on personal knowledge.

While the defendants acknowledge the general and serious risk that gangs present in prison, their evidence soundly refutes Ford's vague assertion that Wallens Ridge officials, policies, or practices tolerate gang violence. On the contrary, the policies the defendants have outlined are directed to preventing inmates from identifying in any way with gangs or acting in a gang-like manner. The undisputed evidence shows only a minimal number of fights occurred in the gym in 2014 and 2015, the years preceding the attack at issue. These numbers simply do not reflect a "longstanding, pervasive, or well-documented" history of inmate attacks, gang-related or not, to put Fleming and Anderson on notice of a substantial risk to Ford's safety in the gym in March 2016. *See Farmer,* 511 U.S. at 842.

Furthermore, the court finds no disputed fact showing that the defendants have responded unreasonably to the risks connected to gang members in prison and their potential unlawful and dangerous activities. The evidence before the court is that Wallens Ridge have met this risk with focused anti-gang policies. As stated, even when officials know of "a substantial risk to inmate

health or safety" and the officials' efforts to prevent harm are not successful, they cannot be held

liable "if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844–45. Because Ford has

failed to offer "sufficient proof, in the form of admissible evidence, that could carry the burden

of proof of his claim at trial," the defendants are entitled to summary judgment as a matter of

law. *Mitchell*, 12 F.3d at 1315–16.

## D. Negligence

It is well settled that the Eleventh Amendment generally bars suits brought by a citizen

against his own state. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 107 n.12 (4th Cir.

2011) (citing other cases). Thus, "nonconsenting States may not be sued by private individuals

in federal court," unless the state has waived immunity. *Bd. of Trs. v. Garrett*, 531 U.S. 356, 363

(2001). Although the Commonwealth enacted the Virginia Tort Claims Act (VTCA) and

allowed itself to be sued for negligence claims filed in state courts, it has not waived its Eleventh

Amendment immunity and has not consented to be sued for negligence claims in federal courts.

*McConnell v. Adams*, 829 F.2d 1319, 1329 (4th Cir. 1987); *Creed v. Virginia*, 596 F. Supp. 2d

930, 938 (E.D. Va. 2009). Under the plain language of the VTCA, moreover, such claims may

only be maintained against the Commonwealth, not against individual state officers like the

defendants. *See* Va. Code § 8.01-195.3.

Ford asserts negligence claims under the VTCA against Gillenwater, Fleming, and

Anderson. Ford alleges that Gillenwater negligently failed to properly supervise the gym area,

and that Fleming and Anderson negligently failed to supervise the number of correctional

officers assigned to the gym. Ford further alleges that the defendants negligently allowed

subordinates to violate prison policy. (Compl. 9–11, 19.) Because Ford may not maintain

negligence claims against individual officials under the VTCA, the court will grant the defendants' summary judgment motion as to such claims.[8]

### E. Due Process

"To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

As a convicted prisoner, Ford did not have an inherent, constitutionally protected liberty interest to avoid or be released from more adverse conditions of confinement. *Id.* at 221–22. A state-created liberty interest may have existed if Ford (a) points to "a basis for an interest or expectation" in avoiding segregation at Wallens Ridge, arising from state regulations, *Prieto*, 780 F.3d at 250; and (b) shows that conditions of confinement in that status "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Ford must make both showings before the court can find that his liberty interest in avoiding segregation was protected under the Due Process Clause and, as such, required federal due process protections before he could be deprived of that liberty interest. *Id.* at 485.

---

[8] Ford's claim against Gillenwater also fails on the facts. The defendants provide undisputed evidence that Gun Post Officer Farmer, and not Gillenwater, was working in the observation tower in the gym on March 22, 2016, and Gillenwater only reported to the gun tower to assist Farmer after hearing Farmer's radio report of the fight. (Anderson Aff. ¶ 4 and Encl. C.)

Ford has not sought to amend his complaint to substitute Farmer as a defendant to his negligence claim. In any event, such an amendment would be futile, because individual officials cannot be sued under the VTCA. *See* Va. Code § 8.01-195.3.

Ford's due process claim focuses on Fleming's order placing Ford back into segregation on May 24, 2016, after only one day in the general population. Ford contends that Fleming did not ensure that Ford received notice or a chance to be heard before this status change occurred. He alleges that the ICA failed to provide him any procedural protections for the next seven days. Then, for weeks, he allegedly could not get consistent or complete answers when he asked why he was still in segregation, with its restrictive conditions and limited privileges.

The evidence shows that Ford received reviews of his classification status. VDOC policy requires a formal due process hearing by the ICA before an inmate can be assigned to administrative segregation and review hearings every 90 days. An inmate has the right to advance notice of a formal ICA hearing, to be present and make a statement or remain silent, and to have an advisor. On May 24, 2016, pursuant to a directive from Fleming, Ford was placed back in segregation. The ICA reviewed his status on May 25, 2016, and recommended administrative segregation, a status intended for protective or custodial management of inmates. This assignment was approved on June 1, 2016. The ICA conducted a 90-day review of Ford's status on August 24, 2016, recommending continued administrative segregation. On August 31, 2016, Ford was transferred to Red Onion State Prison and moved to a general population housing assignment there on September 2, 2016. Ford states that he did *not* receive notice or a chance to be heard within the timetables of the applicable VDOC procedures or receive reasons for his classification assignments. (Collins Aff. ¶¶ 4–6, 8–11 & Encl. A, Dkt. No. 47-2; Compl. 12–18, 20; Ford Aff. ¶¶ 23–28; Ford Decl. ¶¶ 7–10, Dkt. No. 49-2.)

The VDOC's policy requirement for an ICA hearing before assignment to segregation, and the 90-day review requirement, may create an interest in avoiding that status *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring periodic

classification reviews for segregation inmates created potential liberty interest). Ford's due process claim fails, however, on the next step of the analysis—the conditions in segregation, on a temporary basis, do not pose any "atypical and significant hardship," *Sandin*, 515 U.S. at 484, compared to the "ordinary incidents of prison life" Ford enjoyed in the general population. *Prieto*, 780 F.3d at 253 (holding that "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the ordinary incidents of prison life for that prisoner").

Mere limitations on privileges, property, and activities for administratively segregated inmates "fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well established that a temporary assignment to segregated confinement—even six months or more, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures—is *not* atypical or significant hardship. *See Sandin*, 515 U.S. at 485–86 (finding that 30 days in such conditions did not trigger protected liberty interest); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*).

Ford's periods in segregation in 2016 at Wallens Ridge, all told, did not exceed six months. His complaints about living conditions in that status are no more harsh or atypical than

the types of restrictions on privileges and activities at issue in *Sandin* and *Beverati*.[9] For the

reasons stated, the court finds no material fact in dispute on which Ford can establish that his

confinement in segregation at Wallens Ridge was atypical and significantly harsh compared to

conditions contemplated by his sentence. Thus, the court concludes that Ford had no

constitutionally protected liberty interest in avoiding classification to segregation. Therefore, he

also has no actionable claim under § 1983 that he was entitled to, or deprived of, any federally

required procedural protection in his classification and housing review proceedings. *Sandin*, 515

U.S. at 486–87.

Ford also has no claim under § 1983 that any of the defendants misapplied or violated

VDOC classification procedures related to his ICA proceedings in 2016. State officials' failure

to abide by state procedural regulations is not a federal due process issue and is, therefore, not

actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state

law grants more procedural rights than the Constitution would otherwise require, a state's failure

to abide by that law is not a federal due process issue.").

For the stated reasons, the court concludes that the defendants are entitled to summary

judgment as a matter of law as to Ford's claims that they denied him federally required due

process protections related to classification proceedings in 2016. Therefore, the court will grant

defendants' motion for summary judgment as to Ford's due process claims.

---

[9] Conditions in segregation that create a protected liberty interest must be truly harsh and atypical. In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Court found that inmates did have a liberty interest in avoiding assignment to a state's supermax prison. In reaching this conclusion, the Court carefully distinguished the supermax facilities from normal segregation units on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact." *Wilkinson*, 545 U.S. at 214. Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, once assigned to supermax "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. After noting other onerous conditions of confinement, including that the cells were lighted twenty-four hours per day, the court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224. Ford's case is readily distinguishable from *Wilkinson*.

**F. Retaliation**

A First Amendment retaliation claim under § 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity; (2) the defendant took an action that adversely affected that protected activity; and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017).

Prisoners have a "First Amendment right to be free from retaliation for filing a grievance" under the prison's established grievance procedure. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). A plaintiff's "actual response to the retaliatory conduct" is not dispositive of the question of whether such action would likely deter a person of ordinary firmness. *Id.*

To prove causation for a claim for retaliation under § 1983, a prisoner must provide evidence that supports a reasonable inference that a defendant took the alleged retaliatory action because of the prisoner's exercise of a constitutionally protected right. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). He must show that the protected activity was the "'but for' cause of the adverse action alleged." *Ripdath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006). Courts can infer causation when the adverse action occurs shortly after a plaintiff engaged in a protected activity. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015): *see also Honor v. Boaz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (recognizing that the elements of a prima facie Section 1983 and Title VII retaliation

claims are identical). To refute such evidence, defendants can offer a legitimate and permissible reason for their actions. *See Guessous v. Fairview Prop. Invs.*, *LLC*, 828 F.3d 208, 217 (4th Cir. 2016). However, even after defendants have offered a legitimate reason, a plaintiff can still prevail on his claim if the evidence as a whole demonstrates that the proffered permissible reason is not the actual reason but merely a pretext. *See id.*

On April 30, 2016, while housed in segregation, Ford submitted an informal complaint indicating that he had been attacked by "known gang members," he suffered significant injuries during the attack, security officers failed to prevent or stop the attack, and the institution was liable and "criminally negligent" in causing his injuries.[10] Ford then filed a regular grievance raising the same issues on May 17, 2016. (V.S. 2, 4.) The parties do not dispute that Ford's filing of grievances constituted protected First Amendment activity.

On May 23, 2016, Ford was released from segregation into the general population.[11] The next day, on May 24, 2016, Ford was placed back in segregation "pursuant to a directive from" Fleming. Ford was given no other explanation for his placement back in segregation. Ford filed an informal complaint regarding his re-assignment and received a response that he was "placed in segregation under investigation per Warden Fleming." Ford states that Fleming ordered Ford's placement in segregation as "direct retaliation" for Ford having filed grievances. There is no dispute that placement in segregation can satisfy the adverse act element of a retaliation claim. *Martin*, 858 F.3d at 250. Moreover, a fact finder could infer that Ford's grievances

---

[10] The court notes that Ford alleges that, around this time, he also "wrote letters to members of the community in regard to the gang problems at Wallens Ridge and the facilit[y's] tolerance toward them." Ford alleges that those letters were then forwarded to state officials "in an attempt to bring reform and to shed light on the gang problem at Wallens Ridge and the fact that the institution appears to facilitate such activity by their unwillingness to take a proactive approach in addressing it." These statements are corroborated by copies of letters from the VDOC Correspondence Unit which acknowledge Ford's letters and copy Warden Fleming on the responses. (Compl. 12; V.S. 11; Ford Aff. Ex. A & G.)

[11] Ford believes that his release from segregation was a consequence of "numerous complaints, calls, and emails which were made and sent" on his behalf. (Compl. 12.)

caused his placement in segregation, based on the proximity of the events.  (V.S. 6; Collins Aff. ¶ 9; Compl. 15.)

In support of the motion for summary judgment, Fleming avers that he never retaliated against Ford for his filing of grievances and that "Ford's continued assignment to segregation status was because he made statements of a threatening nature."  Fleming states that "[t]o the best of his recollection," the threats were in a letter, but he does not recall "specifics" and cannot locate the letter which included those "perceived threats."  Fleming places no timeframe on the letter and/or threats.  In reviewing the record, the only other reference to a threatening letter is in an August 23, 2016 ICA Hearing Notice which states, "Offender to remain in SEG per Warden Fleming due to seriousness of threats to the institution decided in a letter that Mr. Ford wrote."[12] (Fleming Aff. ¶¶ 8–9; Collins Aff. Encl. D at 33.)

Viewing the evidence and reasonable inferences drawn therefrom in the light most favorable to Ford, the court finds material facts in dispute as to why Ford was returned to segregation on March 24, 2016, and Fleming's evidence has not shown that he is entitled to summary judgment as a matter of law.  Therefore, the court will deny the motion for summary judgment as to Ford's retaliation claim against Fleming.

III.  CONCLUSION

For the reasons stated, the court concludes that the defendants' motion for summary

---

[12] The court notes that a Level I Offender Grievance Response dated June 21, 2016,  states that, "Lt. Fleming, Institutional Investigator[,] reported you were placed back in segregation due to information Wallens Ridge State Prison received from the Correspondence Unit."  It appears to the court that this statement is referencing a letter to Ford (and copying Warden Fleming) from the Correspondence Unit dated May 16, 2016, responding to Ford's mother's email complaining, *inter alia*, about the lack of officers present during the attack and Ford's subsequent medical treatment.  (V.S. 9, 11.)

judgment must be denied as to Ford's retaliation claim against Fleming, but the motion will be granted as to all remaining claims. An appropriate order will be entered.

Entered: September 30, 2018.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge