Case 7:16-cv-00370-EKD-JCH  Document 132  Filed 01/10/20  Page 1 of 17
Pageid#: 755

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
1/10/20
JULIA C. DUDLEY, CLERK
BY: K. Dotson
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| MICHAEL M. FORD, ) | |
|     Plaintiff, ) | Civil Action No. 7:16-cv-00370 |
| ) | |
| v. ) | REPORT & RECOMMENDATION |
| ) | |
| GREGORY T. GILLENWATER, et al., ) | By:   Joel C. Hoppe |
|     Defendants. ) |        United States Magistrate Judge |

Plaintiff Michael Ford, a Virginia inmate appearing pro se, brings this action under 42 U.S.C. § 1983, alleging that Defendant Leslie Fleming placed him in segregation in retaliation for Ford's grievances and letters about gang problems at Wallens Ridge State Prison ("WRSP"), in violation of the First Amendment to the United States Constitution. Compl. 11–12, ECF No. 1. Fleming, the sole remaining defendant, timely filed his Answer and denied the allegations. Answer 1, 3–5, ECF No. 21. This matter is before me for a bench trial and Report and Recommendation on the merits of Ford's retaliation claim against Fleming. ECF No. 95. Having considered the testimony and evidence presented by the parties at trial and the parties' arguments, I find that Ford has not proven by a preponderance of the evidence all the elements of a First Amendment retaliation claim.

I. The Legal Framework

Ford filed his complaint under 42 U.S.C. § 1983, but this provision is not itself a source of substantive rights. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979). Rather, § 1983 creates a civil cause of action against a state actor for the "deprivation of any rights, privileges, or immunities secured by" the federal Constitution. 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271. To prevail under § 1983, a plaintiff must establish that he was deprived of rights guaranteed by the

1

Constitution and that this deprivation resulted from conduct committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). The essence of Ford's claim is that while he was an inmate at WRSP, Fleming (the warden) placed him in segregation in retaliation for his filing of grievances and writing letters about gang problems in the prison. This claim invokes a substantive right "rooted in the First Amendment's Petition Clause." *Martin v. Duffy*, 858 F.3d 239, 249 n.2 (4th Cir. 2017).

A First Amendment retaliation claim has three elements: (1) the plaintiff engaged in activity protected by the First Amendment; (2) the defendant took an action that adversely affected that protected activity; and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. *Martin*, 858 F.3d at 249; *see also Makdessi v. Fleming*, No. 7:13cv79, 2014 WL 5384596, at *2 (W.D. Va. Sept. 22, 2014). "The First Amendment protects the right 'to petition the Government for a redress of grievances,'" *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448 (4th Cir. 2004) (quoting U.S. Const. amend. I), "and the Supreme Court has recognized that prisoners retain this constitutional right while they are incarcerated," *Martin*, 858 F.3d at 249 (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)). *See Martin*, 858 F.3d at 249 ("[B]y alleging that he filed a grievance against a sergeant for battery, Martin has sufficiently pleaded that he engaged in protected conduct."); *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 541 (4th Cir. 2017) (noting prisoners have "a First Amendment right to be free from retaliation for filing a grievance" under the prison's established grievance procedure). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (quoting *Washington v. County of*

*Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). "A plaintiff's actual response to the retaliatory conduct is not dispositive of the question of whether such action would likely deter a person of ordinary firmness." *Martin*, 858 F.3d at 250 (internal quotation marks omitted). Courts have recognized that placing an inmate in segregation sufficiently deters the exercise of First Amendment rights. *See, e.g., id.*; *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012); *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000); *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000).

To prove causation for a claim for retaliation under § 1983, a prisoner must show it is more likely than not the defendant took the alleged retaliatory action because of the prisoner's exercise of a constitutionally protected right. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must . . . . be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006). Courts can infer causation when the adverse action occurs shortly after a plaintiff engaged in a protected activity. *Cf. Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015) (retaliation in violation of Title VII of the Civil Rights Act of 1964); *see Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (recognizing that the elements of a prima facie Section 1983 and Title VII retaliation claims are identical). To refute such evidence, the defendant can offer a legitimate and permissible reason for his or her actions. *Savoy v. Bishop*, 706 F. App'x 786, 790 (4th Cir. 2017) (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016)). Nevertheless, even after a defendant has offered a legitimate reason, a plaintiff can still prevail on his claim if the evidence as a whole demonstrates that the

3

proffered permissible reason is not the actual reason but merely a pretext. *See id.*; *cf. Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (holding that "prison officials may not retaliate against or harass an inmate" for exercising his constitutional rights, "even where the action taken in retaliation would otherwise be permissible" within the prison context).

The Fourth Circuit has instructed district courts to regard retaliation claims by inmates "with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Adams*, 40 F.3d at 74. Additionally, such claims should be treated "with skepticism because every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (internal brackets omitted). I consider Ford's claim under this standard.

## II.  Background

*A.    Facts and Procedural History*

At all times relevant to this dispute, Ford was an inmate in the Virginia Department of Corrections ("VDOC") and was housed at WRSP. Compl. ¶ 14. On March 22, 2016, Ford was housed in general population and was involved in a fight in the gym at WRSP. *Id.* Ford alleges that he was attacked by seven to ten gang members, some of whom had knives. *Id.* ¶ 18. Ford suffered injuries from the fight, including stab wounds and partial blindness. *Id.* ¶¶ 17, 19. After the fight, Ford was treated at an outside emergency room and then admitted to the WRSP medical unit for several weeks. *Id.* ¶¶ 45–46. When he was released from the medical unit, he was placed in segregation. *Id.* ¶ 46. During his time in segregation, Ford filed institutional complaints asserting that he had been attacked by "well known gang members" and that the

4

prison's defective safety policies had "caused" his injuries.[1] Ford was released from segregation on May 23, 2016, but he returned to segregated housing the following day. *Id.* ¶¶ 51–52.

In August 2016, Ford filed this lawsuit against Fleming alleging that Fleming placed him in segregation in retaliation for his exercise of his First Amendment rights. Compl. ¶¶ 45–46, 52.[2] Ford asserted that, except for the fact Warden Fleming directly ordered it, there was "no reasoning or explanation" for his return to segregation less than twenty-four hours after being released to general population in May 2016. *Id.* ¶ 52. Ford alleges that he "suffered psychological harm" as a result of his placement back in segregation. *Id.* ¶ 91. He asks for relief in the form of compensatory and punitive damages. *Id.* at 22–23.

B.   *Trial Testimony*

On November 14, 2019, the parties appeared before me for a bench trial at which I heard testimony from Ford and Fleming. I also heard testimony from the following witnesses:

---

[1] A copy of one complaint stated:

> On March 22nd 2016 an altercation took place where I was attacked by people who I was later informed were Gang members, during this attack I was beaten and stabbed four times in my back and one in my eye . . . . This attack happened uninterrupted in the gym no security officers were there on the floor to stop it or prevent it nor was there an [officer] in the booth "specifically" stationed to the gym area and this institution is not only liable but criminally negligent in the causing of my injuries.

Pl.'s Br. in Opp'n to Mot. for Summ. J., Ex. K, ECF No. 49-1, at 20. This document was received by prison officials on May 2, 2016. An officer responded that according to the investigation of the incident and review of the surveillance camera footage, Ford's claims were "unfounded." *Id.*

[2] Ford's Complaint also included allegations against seven other defendants for (1) improperly responding to grievances and/or appeals, (2) failure to protect Ford from gang violence on March 22, 2016, (3) negligence, and (4) violation of due process. In September 2017, the Honorable Elizabeth K. Dillon, United States District Judge, dismissed, on summary judgment, Ford's claim for improperly responding to grievances and/or appeals. *See* Order of Sept. 25, 2017, ECF No. 41; *see also* Mem. Op. of Sept. 25, 2017, ECF No. 40. Judge Dillon later dismissed, on summary judgment, Ford's other claims against all defendants except for his claim of retaliation against Defendant Fleming. *See* Order of Sept., 2018, ECF No. 56; *see also* Mem. Op. of Sept. 30, 2018, ECF No. 55. Thus, at the time of the bench trial, the only remaining claim before this Court was Ford's First Amendment retaliation claim against Fleming.

Lieutenant Matthew Fleming, Investigator; Christine Carroll, VDOC Correspondence Unit ("CU") Manager; Dennis Collins, Unit Manager ("UM"); and ShaNeice Shearn, Program Support Technician in the CU.

Ford testified on his own behalf. He was initially placed in segregation for approximately two and a half months after the March 22, 2016 fight in the gym. During his time in segregation, he filed an Informal Complaint and Regular Grievance, *see* Pl.'s Ex. 1, ECF No. 130-1, Def.'s Ex. 3, ECF No. 130-15, and sent letters to the community about gang activity in WRSP. Ford's eye was injured, and he was partially blinded in the fight. *See id.* On May 12, 2016, Intelligence Officer B. Berg responded to Ford's informal complaint that "Rapid Eye review does not support [his] claims." Def.'s Ex. 2, ECF No. 130-14. Ford was released from segregation on the morning of May 23, but returned to segregation at approximately 5:00 p.m. the next day with no reason given. He continued to file informal complaints seeking a reason for his return to segregation. *See* Pl.'s Exs. 3, 4, 5, ECF Nos. 130-3, 130-4, 130-5. He was given seemingly conflicting reasons, including that he was "under investigation per Warden Fleming," Pl.'s Ex. 3; that he was "not under investigation [his] status is admin. seg.," Pl.'s Ex. 4; and that he was "not under investigation, [his] housing is based on institutional needs," Pl.'s Ex. 5. Ford also submitted regular grievances asking to be transferred from WRSP. Pl.'s Exs. 6, 7, ECF Nos. 130-6, 130-7. The first response stated that Ford was "placed back in segregation due to information Wallens Ridge State Prison received from the Correspondence Unit. You are housed appropriately." Pl.'s Ex. 6, at 2. His second regular grievance was deemed "repetitive." Pl.'s Ex. 7, at 2. Ford appealed to the Regional Administrator, and Marcus Elam responded that the Level I response from WRSP was appropriate, and he upheld the Level I decision. Pl.'s Ex. 8, ECF No. 130-8. An Institutional Classification Authority ("ICA") notice elaborated upon the reason for his return to

6

segregation: "Offender to remain in SEG per Warden Fleming due to seriousness of threats to the institution defined in a letter that Mr. Ford wrote." Pl.'s Ex. 10, ECF No. 130-10. Ford was not released from segregation until he was transferred to Red Onion State Prison ("ROSP") in August 2016, where he was placed in general population. *See* Def.'s Ex. 8, ECF No. 130-20. Ford admitted on cross examination that he wrote a letter to "Brother Shaheed," which stated in part:

> And the word is that these dudes are going to try to push at me when I come out. And honestly brother between you and I'm afraid of what the outcome will be and the fear I speak of is not in regards to them. But in regards to the fact that from here my only choice is a weapon because I'll never let them hurt me in the way they did. At least not without me hurting one of them in the same way. And I got less than 5 years left and the last thing I want to do at this point is to pick up a weapon but I'm left with no other recourse based on the actions of childish cowards.

Def.'s Ex. 1, at 5–6, ECF No. 130-13.

Defendant Fleming also testified on his own behalf. He did have prior knowledge of Ford's grievances filed in Spring 2016, but he could not recall whether he responded to them. He received an email from Ms. Shearn at the CU on May 24, 2016, at 11:13 a.m., with an attached letter that appeared to threaten others at WRSP. *See* Pl.'s Ex. 12, ECF No. 130-12. He identified Ford as the likely author of the "Brother Shaheed" letter based on context because Ford was the only inmate with an eye injury from the fight on March 22. Because of the threats in the letter, he ordered the watch commander to return Ford to segregation. The next day, Fleming forwarded the email to John Combs, David Anderson, and Kenneth Fleming for investigation. *See id.* Defendant Fleming was not involved in the investigation or Ford's continued status in segregation after he sent the email. He testified that he did not order Ford back to segregation in retaliation for the grievances Ford filed. After the suit was filed, Fleming was promoted to

7

Regional Administrator and no longer had access to his prior email. He was unsure if he had saved the email he forwarded to have Ford investigated.

Defendant Fleming also testified about VDOC segregation policies. Typically, an inmate would be given a reason for his placement in segregation, either in the first written notice he received or at the first due process hearing. An inmate's status and a reason for his placement in segregation would typically be noted in CORIS, the VDOC offender management system. The fact that Ford was not given a reason until months later was not normal. The conflicting responses Ford received about his status did not come from Defendant Fleming, and he posited that Intelligence Officer Harris, who responded to Ford's June 16, 2016 Informal Complaint, *see* Pl.'s Ex. 5, was unaware of the investigation because he was not an investigator. Intelligence officers gather information for investigations, deliver legal mail, and listen to phone calls.

Ms. Shearn testified about CU policies and the letter she forwarded to Defendant Fleming. If correspondence does not have any safety concerns and staff can identify the inmate author, the letter is uploaded and logged into the CU database. If the letter contains safety concerns, however, CU staff immediately send it to the appropriate facility to address concerns, without uploading or logging it into the CU database. Ms. Shearn received the threatening letter, Def.'s Ex. 1, and forwarded it to Defendant Fleming on May 24, 2016, at 11:13 a.m. *See* Pl.'s Ex. 12. Ms. Shearn also testified that the letter was not logged into the CU database because she could not identify the inmate who wrote the letter.

Ms. Carroll also testified about CU policies. She is the current manager of the CU, however, she was not in that role at the time the "Brother Shaheed" letter was forwarded to Defendant Fleming. The only record of the letter is the scan in the email to Defendant Fleming. Per VDOC Operating Procedure 010.3, Section IV.D, there are two ways of processing

8

correspondence. *See* Def.'s Ex. 5, ECF No. 130-17. Staff at CU either log, track, and address the letter or, if there are safety concerns, they send it directly to the appropriate facility to handle. *See id.* Ms. Shearn's actions with the letter to "Brother Shaheed" were consistent with VDOC CU policy.

Lieutenant Kenneth Fleming testified that he received the email from Warden Fleming with the letter to "Brother Shaheed" attached. *See* Pl.'s Ex. 12. He found the email and the letter after searching his old emails several times. The letter was difficult to find because the email did not mention Ford by name. The letter included threats and presented a safety concern for WRSP. It is normal practice to place an inmate in segregation if he threatens others or the institution. Lieutenant Fleming also testified that Ford submitted a Regular Grievance on May 17, 2016, as a follow up to his April 30 Informal Complaint. Def.'s Ex. 3. The Regional Ombudsman responded to Ford's Regular Grievance that it was not timely filed. Def.'s Ex. 4, ECF No. 130-16.

UM Collins testified that he was a member of the ICA committee. He knew of the letter addressed to "Brother Shaheed" and agreed that it presented safety concerns for WRSP. UM Collins reviewed and approved Ford's status change to segregation on June 1, 2016. *See* Def.'s Ex. 6, ECF No. 130-18. He testified that at some point Defendant Fleming had given the rationale for Ford's return to segregation. *See* Pl.'s Ex. 12. Ford was identified as the author of the letter to "Brother Shaheed" and that was the reason for his return and continued stay in segregation. CORIS would have an inmate's housing status and the reason he was placed in segregation, but it would not say "wrote threatening letter." As for the conflicting responses Ford received about his status in segregation, Collins testified that he was unsure how long the investigation lasted and those responding may have been unaware of the investigation.

9

III.  Discussion

In any action tried without a jury, the Court must make specific findings of fact and state its conclusions of law separately. Fed. R. Civ. P. 52(a)(1). In doing so, "[t]he trial judge has the function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable." *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 823 (E.D. Va. 2016). This task also involves evaluating the credibility of witnesses, and the trial judge may "disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias." *Id.* (citing *Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995); *Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889 (4th Cir. 1964)). When articulating its findings of fact, "[a] trial court must do more than announce statements of ultimate fact." *United Am. Ins. Co. v. Fauber*, No. 5:16cv19, 2017 WL 3911019, at *3 (W.D. Va. Sept. 6, 2017) (citing *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986)). The Court is not, however, required "to make findings on all facts presented or to make detailed evidentiary findings . . . . The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

A.  *Factual Findings*

Based on the above background discussion of the competing facts and evidence presented at trial, the Court makes the following findings of fact:

1. Plaintiff Michael Ford is incarcerated in VDOC. He was housed at WRSP in 2016 and transferred to ROSP in August 2016. After his transfer to ROSP, Ford was released from segregation to general population.

2. Defendant Leslie Fleming was the Warden at WRSP during the relevant period.

3. Non-party witness Ms. Shearn was a Program Support Technician in the CU in 2016.

4. Non-party witness Ms. Carroll is the current manager of the CU, but was not in that position in 2016.

5. Non-party witness Lieutenant Fleming was the institutional investigator at WRSP during the relevant period.

6. Nonparty witness UM Collins was a member of the ICA committee during the relevant period.

7. Ford was involved in a fight on March 22, 2016, in the gym at WRSP and placed in segregation after his release from the medical unit.

8. On April 30, 2016, Ford filed an Informal Complaint about gang activity at WRSP. Intelligence Officer B. Berg responded stating that "Rapid Eye review does not support your claims."

9. On May 17, 2016, Ford filed a Regular Grievance making the same allegations as his April 30 Informal Complaint.

10. Defendant Fleming was aware of the grievances Ford filed in Spring 2016.

11. Ford was released from segregation on the morning of May 23, 2016, and returned to segregation at approximately 5:00 p.m. on May 24, 2016.

12. After an ICA hearing, UM Collins approved Ford's status of administrative segregation on June 1, 2016.

11

13. Ford was given only vague reasons for his return to segregation until the ICA notice on August 24, 2016, which stated, "Offender to remain in SEG per Warden Fleming due to seriousness of threats to the institution defined in a letter that Mr. Ford wrote." The alleged threatening letter was not produced to Ford at that time.

14. Inmates would typically be given a reason for their placement in segregation, either in the first written notice or at the first due process hearing. The reason would also typically be placed in CORIS, the offender management system.

15. Ford submitted three informal complaints and two regular grievances after he was returned to segregation, asking for a reason for his return to segregation. Ford was given conflicting reasons, including that he was under investigation per Warden Fleming; that he was not under investigation, but his status was attributable to institutional needs; and that his status was related to information received from the CU.

16. The VDOC CU has two ways to process correspondence. If the correspondence does not contain safety concerns and the author can be identified, then the letter is scanned and uploaded to the CU database and given a log number. If, however, the correspondence contains threats and the author cannot be identified, the letter is scanned and emailed to the appropriate facility to be handled.

17. Ms. Shearn, a Program Support Technician at the CU, received a letter written by an unknown inmate and addressed to "Brother Shaheed" on May 24, 2016. The letter included threats about obtaining and using a weapon against other offenders.

18. In accordance with VDOC CU policy and because of the threats contained in the letter, Ms. Shearn forwarded a scan of the letter addressed to "Brother Shaheed" to Defendant Fleming on May 24, 2016, at 11:13 a.m. Ms. Shearn followed CU policy in forwarding

the letter to the appropriate facility and not logging the letter into the CU database because she could not identify the author.

19. Based on the context in the letter, Defendant Fleming believed Ford wrote the letter to "Brother Shaheed," and he ordered the watch commander to return Ford to segregation on May 24, 2016.

20. Lieutenant Fleming and UM Collins reviewed the letter and agreed that the letter presented a safety concern for WRSP.

21. Defendant Fleming forwarded the email he received from Ms. Shearn, including the letter to "Brother Shaheed," to John Combs, David Anderson, and Kenneth Fleming to investigate on May 25, 2016.

22. Ford wrote the letter to Brother Shaheed that contained threats to obtain a weapon and use the weapon against other offenders.

B.   *Legal Conclusions*

To hold Fleming liable under § 1983 for retaliation against Ford's exercise of his First Amendment rights, Ford must prove by a preponderance of the evidence that he engaged in constitutionally protected First Amendment activity; Fleming took an action that adversely affected that protected activity; and there was a causal relationship between Ford's protected activity and Fleming's conduct. *Martin*, 858 F.3d at 249; *see also Makdessi,*, 2014 WL 5384596, at *2. While Ford has proven the first two elements of a First Amendment retaliation claim, he has not proven the third element.

Ford engaged in protected First Amendment activity when he filed an Informal Complaint and a Regular Grievance during his first time in segregation. *See* Pl.'s Ex. 1; Def.'s Ex. 3. As the Supreme Court has stated, prisoners retain the right to petition the government for

redress of grievances while they are incarcerated. *Turner*, 482 U.S. at 84; *see also Martin*, 858 F.3d at 250; *Booker*, 855 F.3d at 541. Additionally, Ford's return to segregation on May 24, 2016, is conduct that would adversely affect an ordinary person's exercise of his First Amendment rights. *See Martin*, 858 F.3d at 250; *Herron*, 203 F.3d at 416; *Watison*, 668 F.3d at 1115; *Allah*, 229 F.3d at 225. At trial, Defendant Fleming did not contend that Ford failed to prove either the first or second elements.

Ford did not, however, prove that Fleming's retaliation was the "but-for" cause of his return to segregation. *See Nieves*, 139 S. Ct. at 1722. Ford was returned to segregation seven days after he filed an informal complaint and regular grievance about alleged gang activity at WRSP. Nevertheless, temporal proximity is not enough to show a but-for cause. *Hoye v. Clarke*, No. 7:14cv124, 2015 WL 3407609, at *11 (W.D. Va. May 27, 2015) ("The requisite causal connection requires a showing of more than mere temporal proximity between the exercise of a plaintiff's right and the alleged retaliatory action." (collecting cases)). Fleming offered a legitimate and permissible reason for his actions that I find credible and not mere pretext. *Guessous*, 828 F.3d at 217. The day after Ford was released from segregation, Fleming received an email from the CU with a threatening letter attached. The letter was not signed , but the description of the March 22, 2016 events and the injuries the writer sustained logically pointed to Ford as the author. Upon receipt of the letter, Fleming had the watch commander return Ford to segregation while the matter was investigated. The safety of prison personnel and inmates is a legitimate reason for placing an inmate in segregation. *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005) (noting that prisons have an obligation "to ensure the safety of guards and prison personnel, the public, and the prisoners themselves"); *see also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (noting that prison administrators have a duty to "preserve internal order and discipline

and to maintain institutional security"). I find Fleming's testimony that he ordered Ford returned to segregation because of the threatening letter, and not for retaliation, credible and consistent with the evidence that he received the threatening letter from Ms. Shearn on the morning of May 24, ordered Ford returned to segregation later that day, and forwarded the letter for investigation the next day.

Furthermore, the inconsistencies in the responses Ford received to his informal complaints and regular grievances do not raise serious questions about the credibility of Fleming's legitimate reason for placing Ford in segregation. Defendant Fleming testified that an inmate would normally receive a reason for his placement in segregation and that reason would be in CORIS along with his status. In his only contemporaneous statement on Ford's housing status, Fleming responded to Ford's Regular Grievance of May 31, 2016, stating that Ford was "placed back in segregation due to information Wallens Ridge State Prion received from the Correspondence Unit." Pl.'s Ex. 6. He did not write any of the inconsistent responses that Ford received during his time in segregation. Additionally, Fleming and UM Collins testified consistently that the staff who responded to Ford's grievances were likely not involved in the investigation based on their job duties and the fact that they were not on the original email from Fleming to John Combs, David Anderson, and Kenneth Fleming. I understand Ford's frustration in not receiving notification of the reason he was placed in segregation until August 2016. Nevertheless, I cannot find that the breakdown in communication from prison administrators reveals that Fleming's reason for returning Ford to segregation was mere pretext.

I also understand Ford's frustration in the delay for Fleming to produce the alleged threatening letter. The letter that prompted Ford's return to segregation was a personal letter he had written to "Brother Shaheed." Ford had no knowledge or reason to suspect that this letter had

15

been intercepted by the CU and sent to Fleming to address. Without this piece of the puzzle, Ford's return to segregation could appear to be tied to the grievances he had recently filed. Even when Ford was given a reason for his return to segregation in August, the reason was because of "a letter that Mr. Ford wrote," but no details about the letter were offered. Fleming then could not produce the alleged threatening letter until 2019. Explaining the delay, Fleming said he was unsure if he had saved the email from Ms. Shearn that had the letter. Additionally, Fleming was promoted before the lawsuit was filed, and he had lost access to the email that may have contained the letter. Lieutenant Fleming testified credibly that the email was difficult to find because it did not mention Ford by name. *See* Pl.'s Ex. 12. Finally, Ms. Shearn and Ms. Carroll testified consistently that the CU would not upload, log, and track a letter like the one in this case—a letter that included threats and did not explicitly identify the inmate who wrote it. Ford's questions about the authenticity of the letter are understandable, however, he admitted to writing the letter and the email correspondence from Ms. Shearn to Fleming clearly shows the letter was received by Fleming on the same day that Ford was returned to segregation. Fleming and Ms. Shearn also testified consistently about receiving, forwarding, and addressing the letter. I find that the threatening letter written to "Brother Shaheed" provided a legitimate and permissible reason and not mere pretext for Fleming to order Ford returned to segregation. *Guessous*, 828 F.3d at 217. Accordingly, I find that Ford has not proven the third element of his retaliation claim.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge rule in favor of Defendant Fleming and dismiss this action with prejudice.

## **Notice to Parties**

16

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: January 10, 2019

Joel C. Hoppe
U.S. Magistrate Judge